Pursuant to the memorandum opinion filed herein on this date,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment shall be and it is entered in favor of defendant McDonnell Douglas Corporation on plaintiff's complaint.

James E. BOWMAN, Petitioner,

v.

Bill ARMONTROUT; William L. Webster, Missouri Attorney General; William L. Webster, Respondents.

No. 90–0969–CV–W–8.

United States District Court,
W.D. Missouri,
Western Division.

July 15, 1994.

James E. Bowman, pro se.

William J. Bryan, IV, Missouri Atty. General's Office, Jefferson City, MO, for respondents.

## OPINION AND ORDER

STEVENS, Chief Judge.

This matter is before the Court on a number of motions by petitioner and a remand order from the Eighth Circuit.

James Edward Bowman was convicted of felony murder, stealing without consent and armed criminal action on February 27, 1986 in the Circuit Court of Jackson County. He received two consecutive life sentences plus seven years. His conviction was affirmed by the Missouri Supreme Court on direct on November 17, 1987, and by the trial court

after a 27.26 post-conviction proceeding on June 13, 1989.

Bowman's pro se [1] motion for habeas corpus was denied by this Court on August 10, 1992. On March 5, 1993, the Eighth Circuit Court of Appeals, upon motion of petitioner's counsel, remanded the case to this Court to "conduct further proceedings on the issue of newly discovered evidence." The newly discovered evidence is alleged to include: (1) a secret deal between co-defendant Anthony Lytle and the prosecutor; (2) the existence of a polygraph test conducted by the Kansas City, Missouri Police Department that shows that Lytle's confession, which was a key piece of evidence implicating petitioner, was false; (3) the existence of other exculpatory evidence withheld by the Jackson County prosecutor's office; and (4) evidence relating to a Speedy Trial Act violation. In late March 1993, Ronald M. Baugh, attorney for the petitioner, entered an appearance and "accepted appointment" under the Criminal Justice Act.[2]

Since March 1993, petitioner has filed numerous motions, including: motion to conduct discovery; motion to consolidate this case with that of Jon Keith Smith; motion to expand record; motion to preserve and "federalize" evidence; motion for an evidentiary hearing; motion to transfer petitioner and Jon Keith Smith to the Jackson County Detention Center; motion to file an amended petition; motion for summary judgement based upon a secret deal; and motion for summary judgment on grounds relating to falsification of medical evidence.

While petitioner seeks broad-ranging action from this Court, the Court remains bound by its prior ruling in this case and is operating solely on the basis of the remand order from the Eighth Circuit. That remand order forms the starting point for this inquiry:

> Appellant's motion for remand to the district court for evidentiary hearing on newly discovered evidence is granted. The case is remanded with directions to conduct further proceedings on the issue of newly discovered evidence.

Eighth Circuit Clerk's Judgment, March 5, 1993. In accordance with that directive, the Court has allowed substantial briefing on the issue, as well as others, and has held a status conference.

This Court is convinced that the Eighth Circuit did not intend to order this Court to conduct an evidentiary hearing on newly discovered evidence. Rather, this Court believes that its charge was to consider whether claims of newly discovered evidence may be brought, and if so, to take evidence on those claims. There is no indication from the Eighth Circuit that these claims of newly discovered evidence should be treated any differently than other such claims similarly situated.

Since this Court's action is limited by the scope of the remand, it should also be limited to the allegations of "newly discovered evidence" that were presented to the Eighth Circuit as a basis for this remand. Read liberally, Bowman's assertions in filings with the Eighth Circuit allege the following "newly discovered evidence:"

—a "secret deal" between the prosecution and testifying co-defendant Anthony Lytle.

—evidence of a Speedy Trial Act violation.

—sworn statements of Lytle contradicting his confession.

—a Kansas City Missouri Police department polygraph test of Lytle allegedly showing his confession was false.

—withholding of other exculpatory evidence by the Jackson County Prosecutor's office.

—facts that show the prosecution presented false evidence.

—facts that show Lytle's confession is inconsistent with the medical evidence.

—facts that show the prosecution allegedly admitted Lytle's confession was false during the trial of co-defendant Cunningham.

---

1. This Court denied petitioner's request for appointment of counsel.

2. It is unclear whether the Eighth Circuit appointed Baugh to serve in this capacity. This Court has not appointed Baugh.

## STANDARD FOR NEWLY DISCOVERED EVIDENCE

■ Newly discovered evidence that only relates to the guilt or innocence of petitioner will not merit habeas relief. *Herrera v. Collins*, ⸺ U.S. ⸺, ⸺, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993); *Townsend v. Swain*, 372 U.S. 293, 316–18, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). Instead, the newly discovered evidence must bear upon an alleged constitutional violation at trial. *Id.* A federal court sitting in a habeas case cannot correct errors of fact. *Id.*

■ Not only must the evidentiary claim be related to a constitutional issue, but it must also be newly discovered. *See Pickens v. Lockhart*, 4 F.3d 1446, 1450 (8th Cir.1993). Evidence is not newly discovered if petitioner knew of the factual basis for the evidence, or if he could reasonably have presented it to the state trier of fact. *Id.*

■ If petitioner's claim presents evidence that is both "newly discovered" and relating to a constitutional violation, the Court must allow an evidentiary hearing if the allegation is "substantial" and the evidence, if proven, would entitle petitioner to habeas relief. *See Cornell v. Nix*, 921 F.2d 769, 771 (8th Cir. 1990); *Pruitt v. Housewright*, 624 F.2d 851, 852 (8th Cir.1980); *Morris v. Wyrick*, 516 F.2d 1387 (8th Cir.), *cert. denied*, 423 U.S. 925, 96 S.Ct. 268, 46 L.Ed.2d 251 (1975); 28 U.S.C. § 2254. It is not enough that the evidence be merely impeaching or cumulative. *Sims v. Brewer*, 439 F.Supp. 891 (S.D. Iowa), *aff'd*, 567 F.2d 752 (8th Cir.1977).

■ The Court has reviewed the allegations in petitioner's original habeas petition and his petitions for relief filed in the Missouri courts. None of the issues raised here as "newly discovered evidence" were presented to any Court previously. Therefore, unless the claims qualify under the "newly discovered evidence" standard, the claims will be defaulted upon. Defaulted claims are procedurally barred from review by this court unless petitioner can show both cause and prejudice. *Wainright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).[3]

## TRIAL COURT RECORD

Due to the nature of petitioner's claim's the Court finds it helpful to review the record before the jury in Bowman's trial.

Pauline and Earl Chambers were both stabbed and killed during the burglary of their home on November 27, 1983. The defense claimed that defendant had participated in the burglary, but that two other men had killed the victims before defendant and his friends began participating in the burglary.

The evidence before the jury linking petitioner Bowman to the crime was as follows:

Melvin Beverlin of the KCPD testified that he took pictures of the crime scene. He testified those photographs showed a television and a microwave oven to be missing. Tr. 257–262. He also collected footprints from the floor of the house and pieces of plastic and a pocket knife from the driveway. Tr. 263–265. He also testified that there appeared to be a TV missing from the bedroom as well. Tr. 269–270. He testified that there were instructions for a Zenith television, but that the television was not found.

---

3. Petitioner repeatedly urges that in any case, he is entitled to the "actual probable innocence" exception to procedural default. Petitioner's defense at trial, and his story in plea discussions with the prosecutor, was that he engaged in a burglary at the Chamber's home but was not involved when the murders occurred. He and his associates arrived at the Chambers' home to find another party already robbing it. He plotted with his associates to rob the burglars, but instead was invited to join the burglary. He and his associates took property and left. His defense was that the murders occurred before he arrived and without his knowledge.

A conviction for felony murder only requires that petitioner have been involved in the burglary when the murders occurred. Anthony Lytle's confession, upon which the conviction was based, puts Bowman at the scene at the time the murders were committed. While petitioner's arguments may put into question some aspects of Lytle's confession, they do not undermine it so as to convince this Court that twelve reasonable jurors could not convict petitioner. Even if petitioner did not wield the murder weapon, as he argues the evidence shows, that does not prove that he is "actually innocent" of the more broad reaching crime of felony murder.

Daniel Bowerman, a crime scene investigator with the KCPD, testified that on November 28, 1983, he searched the residence of John Keith Smith and recovered a Zenith portable television set. Tr. 285. He then lifted fingerprints from the set and sent them to the Fingerprint Identification Unit of the KCPD. Tr. 286. He also took hair samples from Smith. Tr. 287. He also seized a pair of Nike tennis shoes from Anthony Lytle and a pair of Puma tennis shoes from Smith. Tr. 287–288.

Ray Robinson, a KCPD detective, testified that on November 29, 1983, he conducted a consensual search of 4801 Agnes, where petitioner resided. Tr. 292. He recovered a 21 inch black and white Metalist television set from under the front porch. Tr. 292. The television set had decedent Earl Chambers' social security number engraved on the rear panel. Tr. 294.

Edward Glynn, another KCPD detective, testified that he recovered a pair of Adidas tennis shoes from the residence of Donald Dixon. Tr. 298. He also recovered a pair of petitioner Bowman's boots. Tr. 299. All the shoes recovered by the police were sent to the Regional Crime Lab. Tr. 299.

Richard Schweiterman, a fingerprint examiner from the KCPD, testified that a fingerprint on the Zenith television from Jon Keith Smith's house was that of Mr. Smith. Tr. 311. He was unable to identify the prints of petitioner in the east bedroom where the Chambers' bodies were found. Tr. 313.

Bonita Peterson, M.D., was the medical examiner who performed the autopsy on Mrs. Chambers. She testified as to the location and nature of each of the stab wounds she observed on the body and as to the cause of death of the Chambers. She testified that they both died of knife wounds, and on cross-examination, stated that the knife blades would have had to have been about six inches in length to cause the injuries inflicted. Tr. 334–335. The medical examiner testified that the Chambers may have lived for between thirty minutes to an hour after they were killed.

John T. Wilson, of the Regional Crime Lab, testified that he found a knife at the scene with blood from the victims' bodies. Tr. 343. He also testified he found blood on Jon Keith Smith's Puma shoes. Tr. 344. He did not find anything positively identifiable as blood on any of the other shoes, the pocket knife or in petitioner's car. Tr. 350–352.

John Cayton, a criminologist, testified, that based on comparative tests, photographs and analyses of residue, the Adidas shoes recovered from Donald Dixon created shoe prints recovered from the Chambers' house. Tr. 358–360. He was unable to match any of the shoes of other defendants to other prints found at the scene. He did, however, match the plastic fragments found in the driveway with the Zenith television recovered from Smith's home. Tr. 364.

Bill Hawkins, a neighbor of the Chambers, testified that both television sets belonged to the Chambers. Tr. 374.

Andrea Smith, the sister of Jon Keith Smith, had been friends with Bowman for nine years. Tr. 384. She testified her brother left the house alone about 11:00 p.m. on November 26, 1983, and returned at about midnight. Tr. 385. She heard John talking to petitioner Bowman outside. Tr. 385. The next morning she saw her brother bring a microwave oven in the house. Tr. 386. Later that morning Donald Dixon and petitioner came to the house. She then saw Bowman, Dixon and Smith leave with the microwave. Tr. 385–387. Her brother came back that afternoon with the Zenith television set. Tr. 387.

Anita Kelly, another sister of Jon Keith Smith, testified that the morning after the Chambers murder, she heard petitioner Bowman say "the homicide then was down the street and they had to get rid of the stuff." Tr. 393.

Angela Dewberry, an acquaintance of Bowman's, stated that on the night of the Chambers murder, she was driving around with Bowman, Dixon, Lytle and Smith. Tr. 396. She was dropped off between 11:00 p.m. and 11:30 p.m. Tr. 398.

Anthony Lytle testified that he was in the Chambers home on the night of November 26 into the morning of November 27, 1983.

Tr. 418. He testified that he was there with Bowman, Smith, Dixon, Michael Cunningham and Rodney Cason. Tr. 418. He testified that Smith, Bowman, Dixon and himself were driving around and decided to steal. Tr. 421. He testified that Bowman said "let's go do that." Tr. 421. They tried one house, but were unsuccessful. They went to Smith's house, smoked a marijuana cigarette and decided to try another burglary. Tr. 422. He testified that Smith suggested burglarizing the Chamber's home, since they were old and were never home. Tr. 423. He said they knocked on the door, which was open, but someone inside pushed it shut. Dixon asked if there was a party and a voice responded "No.". Tr. 424. They began to walk away and then saw a man in the window and then decided to rob the people who appeared already to be robbing the Chambers. Tr. 425. Bowman and Smith then returned to Smith's house to get a car that held a shotgun in the trunk, while Lytle and Dixon stayed behind. Tr. 426. A man exited the Chambers house, and was confronted by Lytle and Dixon. Tr. 427. Lytle said they had a conversation, and after determining they knew him, secured permission to go into the Chambers house to rob it. Tr. 427. Smith and Bowman returned with the shotgun and they entered the house. Tr. 427. Lytle stood guard as the others looted the house. He said Smith and Bowman took a microwave and left the house. Tr. 429. Lytle said he then looked around the house and saw a body. Several moments later, either Cason or Cunningham told Lytle "don't worry about it. We took care of him." Tr. 429. He testified that Bowman was gone from the house when he saw the body and that Bowman had not entered the room in which he saw the body. Tr. 429. Dixon and Lytle left the house with the television set, which he said they dropped in the driveway. Tr. 430. They met up with Smith and Bowman and returned to Dixon's house. Tr. 432. They smoked more marijuana, discussed the television set and discussed returning to the Chambers' house for their car. Tr. 433.

Lytle next testified that he had been convicted in relation to this case on charges of felony murder, armed criminal action and robbery, receiving a life sentence on the felony murder charge. Tr. 434. He testified that he had not made any deals to testify and he was doing so because he wanted to. Tr. 436. The following exchange occurred in open court:

Q. (By the prosecutor) And have I made any deals with you, sir, for your testimony?

A. No, you haven't.

Q. And do you understand that under the law I have to tell the Judge and this lawyer sitting here whether or not I have made any promises to you to get you a candy bar or buy you a Coke or to do anything for you. Have I made any promises for anything?

A. No, you haven't.

Q. Why are you testifying?

A. Because I want to.

Tr. 436. He was then questioned about a statement he made to the police on December 2, 1983. Although Lytle had since recanted the statement, the Court allowed the prosecutor to use the prior contradictory statement as substantive, rather than impeaching evidence, pursuant to Mo.Rev.Stat. § 491.074.[4] The statement was read to Lytle line by line. After each line, Lytle admitted having made each statement, but stated that it was not true.

Lytle's December 2 statement portrays a very different set of events. According to the statement, Lytle said Bowman left the house with the television set but returned about five to six minutes later. Tr. 445. Lytle said that when Bowman returned Bowman went into a back room where Lytle had heard the other burglars talking with elderly people. Tr. 446–47. About a minute or two after Bowman entered the back room, Lytle said he heard a scuffle. Tr. 447. He then

---

4. The Missouri Supreme Court upheld this use of the statute on direct appeal. Counsel for petitioner asserts that this law was passed and became effective three weeks before petitioner was re-indicted for this crime. It is apparent that this new evidentiary law bolstered the state's case and counsel may even be correct that the law was passed as part of a scheme to convict his client. However, the fact that a law was passed, in part, to secure petitioner's conviction is not grounds for habeas relief.

saw a head peek out from the room where he said he later saw the body. Tr. 448. Then, according to his statement, he heard the old man yelling "No, No, No," and numerous sounds of pain. Tr. 448. He ran back to the room and saw that "Eddie was standing there over this man I saw one stab, I saw him do the last one and he got up and the other guy that was in the room was saying 'damn,' just 'damn.'" Tr. 450. His statement says he then saw Bowman kneel over the body and stab it one last time. Tr. 451. The knife, according to the statement, was four to five inches long. He described the blood coming from the stomach and the fact that the body was wearing long johns. Tr. 453. Lytle's statement then says that Bowman put the knife in his back pocket and started rifling through drawers. Tr. 454. According to Lytle's statement, in the car after the burglary, the following exchange occurred between Dixon and Bowman: "[Dixon] was asking Eddie why did he do, do what he did, and Eddie was just telling everybody to just shut ... up and Eddie told, told everybody that he had to or either the, the man would have gotten out and started hollering." Tr. 460. He said Bowman had blood all over his jacket and had said that blood squirted everywhere. Tr. 462. For each of the previous statements taken from Lytle's December 2, 1983 confession, Lytle admitted telling it to the police, but denied it was true.

On cross-examination, Lytle stated he was appealing his conviction. Tr. 468. His family had hired one lawyer for the appeal, and another, Lee Nation, to represent him in negotiations with the state. Tr. 469. The following exchange then occurred:

Q. And isn't it true that Mr. Nation was hired for the very specific purpose of trying to make a deal with Mr. O'Connor in return for your testimony here today?

A. Something to that extent.

Q. That's the only reason he's representing you is to try to get you a deal with Mr. O'Connor, trying to get you a lighter sentence; is that right?

A. Something to that extent, yes, sir.

Q. And you know Mr. Nation has spoken with Mr. O'Connor and awful lot about you testifying in this case, hasn't he?

A. Yes, he has.

Q. And you've talked to Mr. O'Connor an awful lot about testifying in this case, haven't you?

A. Yes, I have.

Q. You've talked to Mr. O'Connor over the lunch hour, didn't you?

A. Yes, I did.

Q. And you talked to him last night?

A. Yes, I did.

Q. And the day before that?

A. Yes, I did.

Q. And all last week, almost every day?

A. Not almost every day.

Q. How many times would you say you've talked to Mr. O'Connor about testifying in this case, too many times to count?

A. Yes. I don't know—something like that, yes.

Q. Could it be as many as twenty times that you've talked to Mr. O'Connor?

A. I don't think it has been that many times.

Q. And you tell us here today that there is no deal being made for you testimony in this case, is that right?

A. That's right.

Q. Even though you've spent all this money on a high priced lawyer to talk to Mr. O'Connor and get you a deal, you're testifying without any deal?

A. Yes, I am.

[Mr. O'Connor objects to the inferences and certifies to the court that no deals have been made.]

Q. It's true Mr. Lytle, that you're not getting anything out of this testimony, is that right?

A. That's right.

Q. And you say the only reason you're here today is because you want to be; isn't that right?

A. That's right.

Q. But isn't it true that you're really hoping that you win that appeal and after that appeal if you cooperated with Mr.

O'Connor he is not going to prosecute you for murder anymore?

A. I anticipate something. I don't know—

Q. You're hoping to get something out of this, aren't you?

A. Hoping for something.

Q. You're hoping that all that money spent on Mr. Nation doesn't go to waste, isn't that right?

A. Yes, I am.

Q. And Mr. Nation knows that no deal has been made for your testimony, isn't that right?

A. As far as to my knowledge, yes.

Q. And you know that you couldn't be forced to testify; isn't that right?

A. Right.

Q. But even knowing all that, your lawyer has told you that it's okay for you to go ahead and testify; isn't that right?

A. Right.

Q. And that's because you know that if you don't testify you can't even hope to get a deal out of Mr. O'Connor later, isn't that right?

A. Yes.

Q. And that's why you're here, isn't it?

A. I'm here because I want to be here.

Q. You're here because if you don't testify Mr. O'Connor isn't going to help you, isn't [sic] he?

A. I don't think so. I don't think he would, no, sir.

Q. I don't think he would.

Tr. 469–72. Bowman's counsel then got Lytle to reaffirm that each part of his December 2 statement was a lie. Counsel then walked him through his first story on direct, emphasizing that Bowman had left the house before Lytle even saw a body. Tr. 487. Lytle then testified that he was physically coerced into giving a false statement to police. Tr. 498–99. He said he was hit, threatened and told that Bowman had already talked. Tr. 498–99.

The last witness was Detective Glynn, who took Lytle's statement on December 2. He testified that he did not coerce Lytle into giving a statement and did not strike him.

After closing arguments, the jury returned verdicts of guilty for felony murder, armed criminal action and stealing, and petitioner was sentenced to two life terms plus seven years.

It is clear from the record below that the primary defense was that, although petitioner was involved in the burglary of the Chambers' home, he was not involved until after the Chambers had been killed.

## ANALYSIS

### 1. Secret Deal

Petitioner's central claim of newly discovered evidence is that the prosecutor made a secret deal with Anthony Lytle for his testimony, that such a deal was not disclosed and that the prosecutor elicited false testimony from Mr. Lytle about not having a deal. As reflected in the transcript excerpts above, both O'Connor and Lytle strenuously denied they had any type of deal. However, at Anthony Lytle's 29.15 post conviction relief hearing on January 11, 1990 before Judge Forrest Hanna, the state consented to Lytle's motion to vacate his sentence based upon a prior agreement with Lytle. In explaining the State's position, assistant prosecutor Patrick Peters stated:

[Anthony Lytle] did not cooperate with us in the sense of doing anything unusual. In fact he was arguing against our case, but we believe he knew that by arguing against our case, it allowed us to put the video [of his confession] on, which resulted in the conviction of the three other, we believe, more culpable people, as well as the conviction of Cunningham.

Numerous times people from our office would go down to the pen to visit with him. I think I went on a couple of occasions. Mickey Noud and John O'Connor prosecuted all of the cases. *What we did tell him is that at the first available opportunity we would not oppose an early release,* and at the time our thought was if he came up for parole, we certainly wouldn't stand in the way of parole and would even—and this was never mentioned to him, but in discussion with Bob Dakopolos and John

O'Connor, it was mentioned that we would write a favorable report because in our opinion, he was the least culpable and was actually involved in a burglary [sic].

Lytle 29.15 Hearing, at 7 (emphasis added). Just before the jury was sworn in to hear the case against Bowman, prosecutor John O'Connor offered this version of events: "Anthony Lytle sent a letter to his attorney and to me stating that he wanted to come back to court and also filed a motion with Judge Lombardo in which he wanted to come back as a witness for the Court in these cases. At that time, officers of the Kansas City, Missouri Police Department were sent to the Jefferson City Penitentiary, talked to Mr. Lytle, and he agreed to testify against Mr. Bowman. He never made that agreement before." Tr. 228.

Based on these statements, the Court finds that, at some point, the state made a "deal" with Lytle for his testimony. It is unclear whether the deal was made before or after Lytle testified in Bowman's case. If the agreement came after the his appearance at the Bowman trial, as a reward for testifying, there is no "secret deal," merely a reward as contemplated by Lytle at Bowman's trial.

Reading the Lytle transcript in the light most favorable to the petitioner, the Court could, however, find that the deal was made before his testimony in Bowman's case and that his and O'Connor's denials at trial that any deal existed were false. Although the first reading is more easily reconciled with the record, the Court will presume, for the purposes of this proceeding only, that petitioner's interpretation is the correct one.

The Court will also presume that this evidence is indeed newly discovered. Patrick Peters' statements recognizing some sort of deal were made at the 29.15 hearing for Anthony Lytle. Neither petitioner nor his counsel was present and a transcript of the hearing was not available until requested by petitioner's counsel last year. Therefore, this evidence could not reasonably have been presented to the state trial court.

█ A failure by the prosecution to disclose any agreement with a witness, or failure to correct a false statement by a witness concerning such understandings, violates due process "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Snell v. Lockhart,* 14 F.3d 1289, 1298 (8th Cir.1994); *Byrd v. Delo,* 917 F.2d 1037, 1044 n. 7 (8th Cir.1990).

█ A careful reading of the Lytle transcript does not reveal the existence of any prior "extraordinary" deal, as alleged by petitioner. While the proceedings that led to Mr. Lytle's release were peculiar, they do not confirm the existence of anything beyond a promise not to oppose early parole. Patrick Peters stated that the state did not contemplate a 29.15 motion at such an early date, but saw no reason not to acquiesce. Therefore, for the purposes of deciding whether revelation of Lytle's deal could have affected the jury, the Court will presume that the deal, if it existed at the time of his testimony, was only for the state not to oppose Lytle's parole.

The issue before the Court, then, is whether additional testimony regarding Lytle's motive's for testifying could have swayed the jury. Because of the peculiar nature of Mr. Lytle's testimony and the way in which the jury must have considered it, the Court finds that the additional evidence could not have affected the judgment of the jury.

Lytle in effect testified twice; once in person and once via the December 2, 1983 confession. The live testimony corroborated petitioner's defense and labelled the confession a lie, while the confession testimony provided the only basis on which the jury could convict petitioner of felony murder. *See State v. Bowman,* 741 S.W.2d 10, 14 (Mo.1987). Since the jury found Bowman guilty, they must have believed Lytle's confession and discredited his recantation of it. Therefore, the jury believed the videotaped confession testimony and disbelieved the live testimony.

Evidence of a deal with the prosecution is relevant only to the credibility of a witness and his motives for testifying. Normally, such a deal makes a witness less credible and

calls into question the motives of a witness because his testimony is being paid for by the prosecution. Therefore, the witness will have an incentive to color his testimony to favor the prosecution. The deal will normally affect the credibility of the testimony given in exchange for the deal. Assuming the deal was made after the confession but before the live testimony, evidence of the deal would call into question the motives and credibility of the live testimony.

In this case, evidence of a deal could have caused the jury to call into question Lytle's credibility. However, the deal would have affected only the live testimony, not the confession testimony. The Court cannot fashion a scenario where the jury gives *more* credence to the live testimony of a testifying codefendant because he has a deal with the prosecution. If anything, his credibility would be lessened. Since the live testimony was that which corroborated petitioner's defense, evidence of a deal could have undermined it, not bolstered it.

From the conclusion reached by the jury, the Court must presume that the jury did not believe Lytle's live testimony. They did not believe his repeated assertions that the confession was a lie or that it was beaten out of him. They only believed what they heard from Lytle before any alleged deal was made. Evidence of a deal could not conceivably have affected the jury's evaluation of his denials of that confession.

Finally, the Court finds persuasive the fact that Lytle admitted to everything but a deal during cross-examination. *See* Transcript, *supra.* Lytle admitted that he had hired a lawyer separate from his appellate counsel, for the sole purpose of securing a deal in return for his testimony. That lawyer has met with prosecutors on "an awful lot" of occasions. He testified that he knew that he could expect no favorable treatment if he did not testify, but that he hoped for some if he did. He also stated that he had personally met with O'Connor to prepare for trial on more occasions that he could count. The unmistakable impression from this line of questioning is that Lytle would do almost anything to gain favorable treatment from the state.

In light of the testimony actually given regarding Lytle's cooperation with and expected leniency from the state, the Court cannot say that an explicit affirmance of a agreement by the state not to oppose parole could have affected the jury.

If, in fact, a deal was made for Lytle's testimony before trial and not disclosed,[5] ethical and professional rules would have been violated, but due to the peculiar nature of Lytle's testimony, due process was not.

Petitioner has filed a motion for summary judgment on the basis of this evidence. For the reasons discussed above, that motion will be denied. Furthermore, the Court determines that no evidentiary hearing or further proceedings are warranted. This claim of newly discovered evidence is denied.

### 2. Facts that show Lytle's confession is inconsistent with the medical evidence.

Petitioner argues in a motion for summary judgment that numerous "facts" contained in the medical examiner's report and her trial testimony are inconsistent with Anthony Lytle's confession which describes petitioner stabbing Pauline Chambers. Petitioner argues that the autopsy report contains false and misleading statements about the wound length, location, wound track and angle that were meant to hide the inconsistencies between Pauline Chambers' autopsy and Lytle's confession. Petitioner also alleges that the medical examiner gave testimony at trial that was inconsistent with that report. He argues that he is entitled to relief on the grounds of suppression of evidence, falsification of evidence, presentation of false evidence, and withholding of exculpatory evidence.

Petitioner has not disclosed any evidence that was not available to trial counsel at the time of trial. All of the evidence was contained in the autopsy report or trial testimo-

---

**5.** Although the Court has given petitioner a favorable reading of the record on this issue, the Court believes that the most reasonable reading of the record supports a finding that no deal was secured until after Lytle testified.

ny. The only thing "new" at this time is that petitioner's counsel has read the testimony in a new light, with a medical dictionary at his side. Petitioner also assumes that the stab wounds discussed in the Lytle confession must relate to one particular wound, and deduces that the medical evidence is inconsistent as to that wound. The record reflects that there were over 20 wounds on Mrs. Chamber's body, any of which could correspond to the Lytle confession. Petitioner's reliance on one wound in particular is infirm.

Petitioner's counsel had the reasonable opportunity to raise at trial every argument now advanced. Petitioner claims that this evidence implicates constitutional issues because it is "obvious" that the medical examiner and the prosecutors fabricated Pauline Chamber's autopsy report and then introduced perjured testimony at trial. Beyond counsel's wild speculation, there is nothing to suggest that the alleged discrepancies were intentional or motivated by any dark evil. In fact, the evidence itself suggests that such a theory is impossible. According to the medical examiner's autopsy form, the autopsy was performed on November 28, 1983. The copy of the autopsy form submitted to the court by petitioner reflects on the last page that the form was prepared on November 29, 1983. However, the Lytle confession, with which the autopsy is alleged to have been altered to fit, was not given to police until December 2, 1983. Counsel has no substantial evidence that would suggest that the autopsy form was altered after December 2, 1983 to fit the confession, and then dated retroactively.

As much as petitioner tries, his arguments cannot fit within the rubric of "newly discovered evidence." His fallback argument is that if this evidence was in fact available at trial and trial counsel was failed to raise it, trial counsel was constitutionally ineffective. This is the first time petitioner has raised such a claim. It was not fairly presented to state courts, and therefore, is defaulted upon and procedurally barred. For the reasons discussed above, petitioner is unable to show cause why this claim was not raised before. Since petitioner cannot demonstrate cause

and prejudice, the procedural bar cannot be lifted.

Because there is no "newly discovered evidence" in this allegation, the Court finds that no further proceedings are necessary pursuant to the remand order. For the same reason, petitioner's motion for summary judgment will be denied.

*3. Speedy Trial Act violation.*

Although this issue was raised in the motion to remand, petitioner has not explained what "newly discovered evidence" relates to this claim or why such evidence was not discoverable earlier. Without a particularized allegation, the Court cannot consider this claim. Furthermore, a Speedy Trial Act claim was considered and rejected in previous petitions for relief. Without new evidence, this claim will not be revisited.

*4. Sworn statements of Lytle contradicting his confession and a Kansas City Missouri Police department polygraph test of Lytle allegedly showing his confession was false.*

Petitioner has not described with any particularity what these documents are and why they could not have been discovered with any reasonable effort previously. Without more than bare allegations, the Court will not order further proceedings on these issues.

*5. Withholding of other exculpatory evidence by the Jackson County Prosecutor's office and the prosecution's presentation of false evidence.*

In his motion to conduct discovery, petitioner alleges instances where the prosecution allegedly acted improperly by withholding exculpatory statements of co-defendants. As evidence of these actions, he refers to a deposition of John O'Connor, taken on December 7, 1984. In light of the fact that Bowman did not stand trial until February 1986, the Court cannot fathom how O'Connor's prior deposition can constitute "newly discovered evidence." Petitioner has given no reason why these issues were not or could not have been raised previously.

Other than the medical evidence referred to in section 3, above, petitioner has specified no other specific instances of withholding of exculpatory evidence or similar misconduct.

### 6. The prosecution allegedly admitted Lytle's confession was false during the trial of co-defendant Cunningham.

Petitioner has not presented the Court with a transcript of that proceeding or explained why such evidence was not previously discoverable. Furthermore, petitioner does not explain how this allegation is evidence of a constitutional violation. No further proceedings are required on this issue.

### CONCLUSION

■ Petitioner's counsel has pontificated in numerous inappropriate ex parte contacts with this Court and its personnel that granting of the writ is assured and that the misdeeds of the state are numerous, egregious and obvious. This Court does not agree. It may be that the state stepped very close to the line in its vigorous prosecution of this case, but nothing produced by petitioner convinces this Court that the state has committed acts of constitutional proportions. Petitioner's counsel has also exhorted the actual innocence of his client and the continuing injustice that has resulted. That conclusion is not so obvious as counsel would have the Court believe. Petitioner was convicted of felony murder, that is, being involved in a criminal action during which someone was murdered. His defense is that he was involved in the burglary, but not at the time the murder was committed. The state's evidence was more than sufficient to implicate him in the burglary, while only Anthony Lytle's confession put him in the house at the time of the murder. While the credibility of that confession may be a genuine issue, the jury had before it plenty of evidence with which to discredit it. The jury chose to believe it instead and decision is supported by sufficient evidence.

■ This Court does not believe that the additional items offered by petitioner necessarily would have changed this result. Whether this Court would have reached the same result is not the proper issue in a habeas corpus proceeding. The sole issue this Court may address is whether petitioner was afforded a fundamentally fair trial. In the Court's previous order denying petitioner's motion for habeas corpus, it held that he did. The Court now rules that the "newly discovered evidence" advanced by petitioner does not change that and that no further proceedings are required.

Since the Court has limited authority on remand, petitioner's motion to amend his petition and the motion to consolidate will be denied. Petitioner's motion to expand the record will be granted in part to incorporate all documents filed with this Court in support of petitioner's motions. Accordingly, it is

ORDERED that the Court will conduct no further proceedings on the issue of newly discovered evidence. It is further

ORDERED that petitioner's motion to conduct discovery is denied. It is further

ORDERED that petitioner's motion to expand the record is GRANTED in part and DENIED in part in accordance with this opinion. It is further

ORDERED that petitioner's motion to consolidate is DENIED. It is further

ORDERED that petitioner's motion to preserve and "federalize" evidence is DENIED. It is further

ORDERED that petitioner's motion for an evidentiary hearing is DENIED. It is further

ORDERED that the motion to transfer petitioner and Jon Keith Smith to the Jackson County Detention Center is DENIED. It is further

ORDERED that petitioner's motion to file an amended petition is DENIED. It is further

ORDERED that petitioner's motion for summary judgment based upon a secret deal is DENIED. It is further

ORDERED that petitioner's motion for summary judgment on grounds relating to falsification of medical evidence is DENIED.